# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **JOAN C. WHITT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 12-0698-WS-M** |
| | ) |
| **BALDWIN COUNTY MENTAL** | ) |
| **HEALTH CENTER,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 28). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 28, 30, 32, 36, 45, 48, 49), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

According to the second amended complaint, (Doc. 10), the plaintiff is a licensed professional counselor ("LPC") who was employed by the defendant as an in-home therapist, paired with Danny Langham on a two-person "team." The plaintiff became concerned about Langham's boundaries with underage male clients and his flirtation with adult female relatives of underage clients. In January 2011, she reported her concerns to her supervisor, Jason Tanner, who reacted angrily. With the approval of executive director Robin Riggins, Tanner eliminated the in-home program, which displaced the plaintiff and Langham. Langham was given another position, one for which the plaintiff was more qualified.[1] The

---

[1] The defendant has identified this position as that of assistant program coordinator. (Doc. 30 at 5).

plaintiff sought an advertised position for an outpatient therapist but was told the position was unavailable.

In 1994, the plaintiff suffered a brain aneurysm, but she at no time had difficulties performing the essential functions of her job. However, in February 2011 Riggins told the plaintiff she suspected dementia and requested the plaintiff to undergo a neurological examination. The plaintiff agreed, and the neurologist reported that she was medically fit to counsel clients.

Nevertheless, the plaintiff was not placed in a position involving client contact but was assigned to write treatment plans that the responsible male employee had failed to write. Once she completed this assignment, she was left with no work to perform. Tanner hired a male to take the plaintiff's position, and Riggins informed the plaintiff there were no positions available for her. The plaintiff complained to Riggins that she was discriminating against her based on sex and perceived disability. On or about February 26, 2011, the defendant fired the plaintiff.

The second amended complaint includes the following seven "claims for relief":

- Count One    Sex discrimination (terms and conditions)          Title VII
- Count Two    Sex discrimination (termination/failure to hire)   Title VII
- Count Three  Retaliation                                        Title VII
- Count Four   Disability discrimination                          ADA[2]
- Count Five   Retaliation                                        ADA
- Count Six    Defamation
- Count Seven  Negligent/wanton training/supervision/failure to investigate

(Doc. 10 at 7-11).

---

[2] Count Four also includes an allegation of retaliation under the ADA, which is redundant with Count Five.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

**I. Exhaustion.**

"[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Department of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotes omitted). The defendant, citing *Gregory*, argues that this rule precludes the plaintiff's retaliation claims. (Doc. 30 at 16-18).

It is true, as the defendant notes, that the plaintiff's EEOC charge does not check the box indicating retaliation and that the word "retaliate" does not appear at all. But this was also true in *Gregory*, a case in which the Eleventh Circuit held that the retaliation claim was not barred for lack of exhaustion. 355 F.3d at 1278-79. It is also true, as the defendant notes, that the body of the charge does not indicate that the plaintiff complained to her employer of discrimination, or

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

anything else, before her termination.  Again, however, this was also the case in
*Gregory*.  *Id*. at 1279, 1280.

In *Gregory*, the pro se employee (a psychiatrist) filed a charge alleging race
and sex discrimination in her termination, and the facts and beliefs she asserted in
the charge were directed only towards these two unlawful bases of decision.  The
Eleventh Circuit stressed the solicitude due a pro se complainant, the judicial
"reluctan[ce] to allow procedural technicalities to bar claims," and the admonition
that "the scope of an EEOC complaint should not be strictly interpreted."  355
F.3d at 1280 (internal quotes omitted).  The Court held that the EEOC
investigation reasonably to be expected to grow out of the plaintiff's charge would
include retaliatory termination because the charge identified allegedly
discriminatory acts occurring shortly before the termination, even though the
charge did not allege that the plaintiff complained about this discrimination.  *Id*.

> The facts alleged in her EEOC charge could have reasonably
> been extended to encompass a claim for retaliation because they
> were inextricably intertwined with her complaints of race and sex
> discrimination.  That is, she stated facts from which a reasonable
> EEOC investigator could have concluded that what she had complained
> about is retaliation because of her complaints [which were not mentioned
> in the charge] of Dr. Fuller's disparate treatment to the hospital's
> administration.  Specifically, shortly after being subjected to certain
> allegedly discriminatory acts, she was terminated.  An EEOC investigation
> of her race and sex discrimination complaints leading to her termination
> would have reasonably uncovered any evidence of retaliation.

*Id*.

The plaintiff's EEOC charge (apparently filed pro se) alleges as follows:
(1) on January 18, 2011, Riggins eliminated the in-home therapy program; (2)
Langham thereafter received another position but the plaintiff was offered none;
(3) on January 28, 2011, Riggins requested that the plaintiff be seen by a
neurologist even though the plaintiff was performing all the duties of three
positions; and (4) on February 25, 2011, Riggins terminated her.  (Defendant's

Exhibit 4).  As in *Gregory*, the charge alleges specific discriminatory conduct occurring shortly before the plaintiff's termination.

The defendant has invoked *Gregory* but has failed to address the facts of that case as compared to this one, and the Court will not search for possible distinguishing details on the defendant's behalf.  The defendant cites three trial court decisions for the proposition that "the factual basis for the retaliation claim must be included in the charge," (Doc. 30 at 18), but, to the uncertain extent these cases purport to require more information that was found adequate in *Gregory*, they cannot be followed.

In summary, on the argument and authority presented, the defendant is not entitled to summary judgment on the basis of failure to exhaust.[4]

## II.  Count One – Sex Discrimination (Terms and Conditions).

According to the defendant, plaintiff's counsel orally confined this claim to Langham's laziness, burn-out and flirtation with others, as well as the plaintiff's assignment (after the in-home therapy team was eliminated) to conduct treatment plan reviews.  (Doc. 30 at 20).[5]  The plaintiff identifies no additional terms and

---

[4] Because this case appears to be on all fours with *Gregory*, it is unnecessary to consider the plaintiff's argument that factual allegations made in her EEOC intake questionnaire, (Plaintiff's Exhibit 2), which she apparently completed and delivered to the EEOC at the same time as her charge, satisfy the exhaustion requirement.  (Doc. 45 at 20).  *See, e.g., Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 n.36 (11th Cir. 2000) (considering the plaintiff's intake questionnaire in assessing the scope of the EEOC investigation to be reasonably expected); *B.K.B. v. Maui Police Department*, 276 F.3d 1091, 1102 (9th Cir. 2002) ("If the charge itself is deficient in recording her theory of the case due to the negligence of an agency representative who completes the charge form, then the plaintiff may present her pre-complaint questionnaire as evidence that her claim for relief was properly exhausted.").

[5] The parties apparently did not establish the parameters of Count One via formal discovery.

conditions encompassed within Count One other than her termination, (Doc. 45 at 20), which must be addressed under Count Two, not Count One.[6]

A Title VII plaintiff must "establish, as part of h[er] prima facie case, that [s]he suffered so-called 'adverse employment action.'" *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). This requires that the challenged action by the employer "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Id*. at 1239. Thus, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employer must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id*. (emphasis in original). "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. The defendant challenges the plaintiff's ability to satisfy this element of her prima facie case. (Doc. 30 at 20-21).

"Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis*, 245 F.3d at

---

[6] The defendant believes that the plaintiff in her brief limited Count One to a claim involving termination, on the grounds that this is the only conduct she discussed in that portion of her brief addressing Count One. (Doc. 48 at 3). But "summary judgment cannot be granted by default." Fed. R. Civ. P. 56 advisory committee notes to 2010 amendments to Rule 56(e); *see also United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."). The plaintiff's mere failure to discus in her brief the non-termination aspects of Count One, unaccompanied by an express abandonment of those aspects, does not remove them from the case.

That said, the plaintiff's threadbare brief suggests a lack of interest in many aspects of her varied claims. The Court is left with the impression that it has devoted well over a week of judicial resources to carefully resolving a complicated motion as to claims and portions of claims about which the plaintiff is not truly serious. If the Court's impression is correct, the plaintiff's failure to expressly withdraw or abandon such claims and portions thereof has done a disservice to the Court, the defendant and the litigants in other cases whose motions have lain unresolved as the Court wrestled with the defendant's motion for summary judgment.

1244. Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on h[er] disagreement with h[er] employer's reassignment of job tasks." *Id*. "In the vast majority of instances, … we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress …." *Id*. at 1245.

The plaintiff's challenge to her short-term assignment to write or review treatment plans constitutes a work assignment claim. She does not assert that the assignment amounted to a demotion, that it decreased her compensation, that it adversely affected her chances for promotion, or that it in any other way tangibly affected her employment. Indeed, she does not even claim that the assignment carried a loss of prestige. Under this state of affairs, the plaintiff cannot establish a prima facie case as to her work assignment claim.

The balance of Count One complains that Langham was a slacker. The plaintiff does not assert that this had any effect, much less a serious and material effect, on the terms and conditions of her employment. On the contrary, she identifies the only effect on her of Langham's work ethic as being indignation that he was being paid roughly the same as she and was wasting taxpayer dollars. (Doc. 45 at 2).

In summary, the plaintiff cannot establish that she suffered an adverse employment action with respect to the matters on which Count One is based. To the uncertain extent that Count One also addresses the plaintiff's termination, (Doc. 45 at 20), it is redundant with Count Two and is due to be dismissed on that basis. The defendant is thus entitled to summary judgment with respect to Count One.

**III. Count Two – Sex Discrimination (Termination, Failure to Hire).**

Count Two alleges that the defendant "terminated Plaintiff's employment because of her sex and failed to hire [her] to other positions available with Defendant because of her sex." (Doc. 10 at 8).

The defendant recognizes that the "failure-to-hire" aspect of this claim addresses the defendant's failure to award the plaintiff a position as outpatient therapist and its failure to return the plaintiff to her prior position as in-home therapist. (Doc. 30 at 23). The failure-to-hire aspect also extends to the allegation, made in the second amended complaint and repeated in the plaintiff's briefing, (Doc. 10, ¶ 30; Doc. 45 at 16, ¶ 63), that the plaintiff should have received the assistant program coordinator position given Langham after the in-home therapy program was eliminated.[7]

To prove disparate treatment, "a plaintiff may offer either direct evidence or circumstantial evidence." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012). The plaintiff does not purport to have direct evidence of discrimination. The claim is thus governed by the *McDonnell Douglas–Burdine* model developed for cases based on circumstantial evidence. The burden is first on the plaintiff to establish a prima facie case. If she succeeds, the defendant must meet its burden of producing evidence of one or more legitimate, nondiscriminatory reasons for the adverse employment action. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are a mere pretext for illegal discrimination. *Id*. at 1055-56.

"A plaintiff may establish a prima facie case of discrimination [in termination] through circumstantial evidence by proving that (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more

_____

[7] As discussed in note 6, *supra*, and contrary to the defendant's suggestion, (Doc. 48 at 3), the plaintiff did not abandon the failure-to-hire aspect of her claim simply by not addressing it in her brief.

favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). The parties agree to employ this formulation of the prima face case and to use it for both the termination claim and the re-assignment claims. (Doc. 30 at 22-23; Doc. 45 at 20-21). They further agree that the plaintiff may satisfy the third element by the alternative means of showing that she was replaced by, or passed over in favor of, a member of the opposite sex. (*Id.*).

To meet its intermediate burden, the defendant must articulate a reason "legally sufficient" to justify judgment in its favor and must support the articulated reason "through the introduction of admissible evidence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). The defendant "must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998). Thus, "[t]he defendant cannot testify in abstract terms as to what might have motivated the decision-maker …." *Id*. Again, "[t]he defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question …." *Id*. at 1184.

"The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for [sex discrimination]." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir.2008) (internal quotes omitted). The plaintiff's burden is to "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008). Of course, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys*

*Customer Management Group Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (internal quotes omitted). To make this showing, the plaintiff may resort to "all the evidence," *Crawford,* 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000).

### A. Assistant Program Coordinator.

Because the defendant has not addressed the plaintiff's claim that she was denied this position due to sex discrimination, it cannot obtain summary judgment. The Court nevertheless offers the following observations.

As an initial matter, it appears the plaintiff can establish a prima facie case of sex discrimination. First, the plaintiff is of course a member of a protected class (female). Second, her failure to receive the position appears clearly to be an adverse employment action, especially given that her former position had been at least temporarily dissolved. Third, the position was awarded to a male (Langham). Finally, the plaintiff appears to be minimally qualified for the position.[8]

The Court notes the defendant's argument that, for purposes of her prima facie case, the plaintiff was not qualified to serve as an in-home therapist or as an outpatient therapist because she had displayed poor professional judgment. (Doc. 30 at 23). The plaintiff's judgment, however, is irrelevant to her prima facie case as to any position. "[T]o demonstrate that [s]he was qualified for the position, a

---

[8] The defendant has not identified the minimum qualifications for this position, but it can be assumed that Langham met them, else he would not have received the job. The plaintiff is an LPC, with a Master's degree in counseling and a state license to conduct a clinical practice. (Doc. 30 at 2). Langham has no advanced degree, and his bachelor's degree apparently is in a different, "human services field." (*Id.*). The defendant concedes that, on the in-home therapy team, the plaintiff "had more and different responsibilities than Langham," (*id.* at 21), which further suggests she at least matched him in qualifications and thus possessed the minimum qualifications for the assistant program coordinator position.

Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications. … [S]ubjective evaluations play no part in the plaintiff's prima facie case [but] are properly articulated as part of the employer's burden to produce a legitimate [sex]-neutral basis for its decision …." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005).

The defendant has not articulated a sex-neutral reason for awarding the position to Langham rather than to the plaintiff. The reason it provides for not awarding her a therapist position – that her failure to report suspected patient abuse reflected poor professional judgment rendering her unfit to be placed in direct patient contact – cannot easily be applied to the position awarded Langham, since the defendant concedes that, "[i]n this position, Langham did not work directly with patients." (Doc. 30 at 5 n.27). Moreover, it apparently was not until after awarding the position to Langham that the defendant concluded the plaintiff had exercised poor judgment.

### B. Outpatient Therapist.

The defendant concedes the first two elements of the plaintiff's prima facie case. (Doc. 30 at 23). The defendant denies the fourth element, but only on the grounds that the plaintiff had demonstrated poor judgment. (*Id*.). As discussed in Part III.A, however, only objective qualifications can be considered in connection with the prima facie case.

As to the third element of the plaintiff's prima facie case, it is uncontroverted that a female filled the outpatient therapist position. (Riggins Declaration, ¶ 24; Doc. 32 at 15, ¶ 32; Doc. 45 at 13, ¶ 32). The defendant argues the plaintiff cannot show the existence of a similarly situated male treated more favorably, (Doc. 30 at 23), but in fact the plaintiff has identified no comparator at all. (Doc. 45 at 19-21).[9] Her claim thus fails.[10]

---

[9] The only two comparators identified by the plaintiff relate exclusively to her termination claim. (Doc. 45 at 20).

### C. In-Home Therapist.

The plaintiff satisfies the first, second and fourth elements of her prima facie case for reasons stated in Parts III.A and B. As to the third element, the defendant argues the plaintiff was not replaced, in that the in-home therapy team of which she was a part was not re-constituted for over a year after it was dissolved. (Doc. 30 at 23). The plaintiff responds that Don Earnshaw replaced her. (Doc. 45 at 21). The defendant replies that Earnshaw merely took over the plaintiff's "secondary duties" of in-school counseling. (Doc. 30 at 2, 23). The defendant assumes that the label "secondary duty" negates the plaintiff's ability to show she was replaced, but it offers neither argument nor authority in support of such a proposition. Since the term is undefined, for all that appears the plaintiff's in-school counseling duties may have been as time-consuming and significant as her in-home therapy duties. Certainly on this record the defendant has not shown the plaintiff cannot establish that she was replaced for purposes of her prima facie case.

The defendant articulates the following sequence as its legitimate, non-discriminatory reason. First, the defendant dissolved the plaintiff's in-home therapy team due to her allegations of impropriety by Langham. Second, the team assembled to investigate the plaintiff's allegations concluded that she had insinuated sexual abuse and believed each underlying event had occurred and yet had failed in her ethical obligation as an LPC to report Langham's conduct. Third, Riggins concluded that the failure to report suspected abuse violated ethical standards and positive law and reflected unacceptably poor judgment for one in direct patient contact. Fourth, in consequence of her poor judgment, Riggins ruled

---

[10] Even could the plaintiff establish a prima facie case, her claim would fail for reasons stated in Part III.C.

out placing the plaintiff in any position involving direct patient contact (including outpatient therapist, in-home therapist and in-school counseling).

The defendant's proffered reason plainly is legally sufficient, and it is supported by record evidence. The plaintiff does not argue otherwise. Accordingly, the burden shifts to her to show that a properly functioning jury could conclude that the defendant's articulated reason is but a pretext for unlawful sex discrimination.

The plaintiff devotes two sentences of argument to this difficult task. First, she notes that Langham was not fired and that Earnshaw replaced her. (Doc. 45 at 21). Since neither of them displayed the plaintiff's poor judgment,[11] the defendant's retention of them does not suggest pretext. Second, she argues that, if her judgment truly were faulty, the defendant would not have offered her a position performing treatment plan reviews. (*Id*. at 22). But since the plaintiff's poor judgment was in the realm of patient safety, and since the offered position did not involve patient contact, the offer is perfectly consistent with the defendant's articulated reason.

With that, the plaintiff's efforts to establish pretext are exhausted. And that would be the end of the matter, except that the defendant in its reply credits the plaintiff with the assertion (which could be teased out of her factual rendition but which is nowhere articulated as an argument) that she did not fail to timely report suspected client abuse (and therefore did not exhibit poor judgment) because she did not in fact suspect such abuse. (Doc. 48 at 4). The Court therefore explores that possibility.

---

[11] The investigative team concluded that Langham behaved appropriately and in accordance with the intended model of the in-home therapy team in each instance identified by the plaintiff. (Defendant's Exhibit 15 at 14). (The report does not specify whether this conclusion is based on a finding the alleged conduct did not occur, that it occurred but complied with expectations, or some combination of both.) While the plaintiff may have thought Langham displayed poor judgment, she does not argue that the team's contrary conclusion is insupportable or otherwise reflects a discriminatory bias.

The plaintiff first addressed her concerns verbally with Jason Tanner. It is uncontroverted that she told Tanner she "was having a problem with [Langham] … taking boys off alone or attempting to take boys off alone" and that she "believe[s] [Langham] to have a problem with … boys." (Doc. 32 at 3, ¶ 7; Doc. 45 at 3, ¶ 7).

At Tanner's direction, the plaintiff prepared a written timeline of the events involving Langham which she wished to report. Among other incidents, the timeline includes the following: (1) Langham transported a boy to an appointment alone; (2) Langham took a boy in the woods to shoot paint balls; and (3) Langham met alone for 30 minutes with an underage male client in a bedroom with the door closed. The plaintiff wrote that, in light of these incidents (all occurring in July 2006), she concluded that "the current boundaries that the South in-home Team is displaying are unclear and unhealthy." The plaintiff then told Langham he was not allowed to escort a child alone, engage in individual therapy with a child alone, or administer awards without a family member present. In early 2008, Langham requested to meet alone with a male client, but the plaintiff resisted and Langham, though angry, relented. In late 2008, a male client experienced an attempted abduction, after which Langham insisted on changing his therapist. Also in late 2008, Langham instituted a reward system with an underage male client that involved the two of them being alone in a secluded room. (Defendant's Exhibit 14 at 1-2).

Riggins appointed a three-person committee to review the plaintiff's allegations and, after reviewing her timeline, they interviewed her. They asked the plaintiff if she believed sexual abuse may be a problem in this situation, to which she responded that it was not her call to make. She stated she was seeing inappropriate boundaries, not sexual abuse, but she continued that she would not trust Langham with her grandchildren. (Defendant's Exhibit 15 at 2).

Earlier this year, the plaintiff sat for her deposition. When asked about the attempted abduction of a client, the plaintiff testified that she thought Langham

might have been involved, because Langham displayed a "fixat[ion]" on the child by insisting on changing his therapist. (Plaintiff's Deposition at 111-15). Asked to identify the circumstances under which reporting of abuse is mandatory, the plaintiff testified that reporting is mandatory only when abuse is witnessed, not when it is merely suspected, and she explained that she did not report Langham earlier "[b]ecause it's suspicious behavior. I have not witnessed anything." (*Id.* at 182-84).

This material suggests that the plaintiff suspected Langham of abuse. She believed that Langham had a "problem with … boys"; she believed it inappropriate and "unhealthy" for Langham to be alone in a closed bedroom with a teenaged patient; she believed he was "fixated" on another client and suspected he had tried to abduct the client; and she would not trust him with her grandchildren. Finally, she defended her failure to report Langham on the grounds that, while he engaged in "suspicious behavior," she had not actually witnessed abuse. The plaintiff's effort in her recent declaration to deny that she said what her own written timeline explicitly states, and to contradict her clear answers to unambiguous deposition questions, cannot create a fact issue in this regard.[12] But even if there is some question of fact as to whether the plaintiff in her own mind actually suspected abuse, that of itself could not create a fact issue as to pretext. The question is not whether the plaintiff actually suspected abuse but whether Riggins believed she had suspected abuse and whether Riggins acted based on that

---

[12] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "A district court may disregard an affidavit as a sham when a party to the suit files an affidavit that contradicts, without explanation, prior deposition testimony on a material fact," at least "when the earlier deposition testimony … consists of clear answers to unambiguous questions which negate the existence of any genuine issue of material fact …." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012).

belief.[13]  Riggins has so testified, and nothing in the plaintiff's evidence draws her testimony even remotely into question.

Finally, it is worth noting that Riggins and all three members of the team that investigated the plaintiff's complaint are female.  "While we acknowledge that a Title VII violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim, [citation omitted], we note that the district court found that there was no evidence that [the decision-maker] held members of his own race to a higher standard of conduct than members of another race." *United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir. 1995).  The plaintiff has identified no such evidence in this case, no reason to suspect that any of these females were prejudiced against members of their own gender.

Because the plaintiff cannot create a genuine issue of material fact as to whether the defendant's articulated reason is a pretext for sex discrimination, the defendant is entitled to summary judgment as to this claim.

### D.  Termination.

The plaintiff meets the first, second and fourth elements of her prima facie case for reasons set forth in Parts III.A and B.  She claims to meet the third element both because she was replaced by a male and because a similarly situated male was treated more favorably.

---

[13] "We can assume for purposes of this opinion that the complaining employees interviewed by Rives were lying through their teeth.  The inquiry of the ADEA is limited to whether Rives, Malone and Merrill believed that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *accord Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The question is not whether it really was Alvarez's fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall asleep at her desk.  The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about Alvarez as cover for discriminating against her because of her Cuban origin.").

The Court has addressed the plaintiff's replacement argument in Part III.C. The plaintiff identifies Langham and Rusty Higgins as similarly situated male comparators who were not fired. (Doc. 45 at 20, 21).[14] The defendant argues they cannot be similarly situated because they, unlike the plaintiff, did not violate the defendant's mandatory policy on reporting suspected client abuse. (Doc. 30 at 23). But the two cases on which the defendant relies addressed differences in rules violations at the pretext stage, not as part of the plaintiff's prima facie case.[15] The defendant has failed to show that the plaintiff cannot establish the existence of a similarly situated comparator who was not terminated.

The defendant's articulated reason for the plaintiff's termination is an expansion on its reason for not offering her any position requiring direct patient contact. Once Riggins determined she could not allow the plaintiff such a position, she offered the plaintiff a continued position performing treatment plan reviews, but the plaintiff refused the position. There were no other available positions. With all options for continued employment exhausted, the defendant fired the plaintiff. (Doc. 30 at 23-24, 28). This is a legally sufficient reason for the plaintiff's termination, and it is supported by record evidence. The burden thus shifts to the plaintiff to demonstrate the existence of a genuine issue of fact as to pretext.

As before, to show pretext the plaintiff argues only Langham's retention, her replacement by Earnshaw, and the offer to her of another position. (Doc. 45 at 21, 22). As discussed in Part III.C, these matters raise no genuine issue of pretext.

---

[14] Higgins is the therapist whose treatment plan reviews the plaintiff conducted and brought up to date after the in-home therapy team was dissolved. (Doc. 30 at 20).

[15] When the claim is one of disparate discipline, the plaintiff must show as part of his prima facie case that his comparator engaged in "nearly identical" misconduct. *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006). The defendant does not invoke this standard, so the Court does not apply it. At any rate, it appears unlikely the defendant could properly invoke the rule, since it does not claim to have fired the plaintiff as a sanction for violating a company rule.

And, as also discussed in Part III.C, the plaintiff's effort to deny that she harbored any subjective suspicion of abuse by Langham, even if successful, would not create such an issue.

### E. Summary.

The defendant is entitled to summary judgment with respect to all aspects of Count Two except the plaintiff's claim that she was denied the position of assistant program coordinator based on her sex.

## IV. Count Three – Retaliation (Title VII).

Similar to discrimination cases, a retaliation case not based on direct evidence follows a burden-shifting format. First, the plaintiff must make out a prima facie case. Second, the defendant must produce evidence of one or more legitimate, non-retaliatory reasons for the plaintiff's adverse treatment. Third, the plaintiff must show that the defendant's proffered reasons are a pretext for prohibited retaliatory conduct. *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

"A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970.

The plaintiff identifies her protected activity as: (1) her January 18, 2011 report to Tanner about Langham; and (2) her February 22, 2011 statement to Riggins that Riggins "was discriminating against [the plaintiff] and allowing males to have positions for which [the plaintiff] was more qualified." (Doc. 45 at 21-22; Plaintiff's Exhibit 1, ¶ 44).[16] The defendant identifies the alleged retaliatory

_____

[16] The defendant reads the plaintiff's brief as limiting the alleged protected activity to her January complaint (reduced to written form) concerning Langham. (Doc.

actions as: (1) dissolving the in-home therapy team; (2) not reassigning the plaintiff to another therapist position; and (3) terminating her employment. (Doc. 30 at 25). In her brief, the plaintiff identifies another: being required to undergo a medical examination. (Doc. 45 at 22).[17]

While Title VII's retaliation provision contains both an "opposition" prong and a "participation" prong, the plaintiff relies exclusively on the former. "It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because he has opposed any practice made an unlawful employment practice by this subchapter …." 42 U.S.C. § 2000e-3(a). Although the plaintiff need not prove an actual violation of Title VII to support a retaliation claim for opposing the practice, she must have possessed "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1213 (11th Cir. 2008) (internal quotes omitted). "A plaintiff must not only show that [s]he *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was *objectively* reasonable in light of the facts and record presented." *Id.* (emphasis in original; internal quotes omitted). "[T]he reasonableness of [a plaintiff's] belief that [the defendant] engaged in an unlawful employment practice must be measured against existing substantive law." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (internal quotes omitted). That is, an otherwise unreasonable belief that the defendant's conduct was unlawful under Title VII is not rendered reasonable by the plaintiff's "ignorance of the substantive law." *Weeks v. Harden Manufacturing Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002).

---

48 at 8). Since the plaintiff's brief addressing her retaliation claim states that she complained to Riggins of sex discrimination on February 22 and was "immediately fired," (Doc. 45 at 21-22), the Court cannot agree.

[17] Again, it appears the parties failed to define the parameters of this claim through formal discovery.

### A. Complaint of Langham's Conduct.

"Title VII prohibits discrimination against 'any individual' with regard to that individual's terms and conditions of employment or application for employment.  See 42 U.S.C. § 2000e-2(a) (1994).  The statute does not define 'any individual,' and although we could read the term literally, we have held that only those plaintiffs who are 'employees' may bring a Title VII suit."  *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1242 (11th Cir. 1998).  As the defendant points out, (Doc. 30 at 26), the male patients and the female relatives of those patients were not its employees, past, present or future.  Therefore, Langham's conduct towards them could not possibly violate Title VII.  No plaintiff acquainted with Title VII could reasonably believe otherwise.

The plaintiff does not suggest that Langham's conduct towards his patients and their relatives constituted sexual harassment as to her, and any such suggestion would be patently meritless.  "To be actionable under Title VII, a hostile work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so."  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) (internal quotes omitted).  There is no evidence that the plaintiff subjectively found Langham's conduct to create a hostile work environment, and no plaintiff acquainted with Title VII could reasonably believe her work environment was unlawfully hostile in the absence of such a subjective belief.

Nor could a plaintiff acquainted with Title VII reasonably believe that Langham's conduct created an objectively hostile work environment.  As to the adult females, the plaintiff complained only of "flirting" on a few occasions over a span exceeding four years, and "flirtation is not sexual harassment."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 584 (11th Cir. 2000).  If flirtation cannot be sexual harassment, witnessing flirtation cannot be sexual harassment, either.

As to the teenage boys, the plaintiff complained of no sexual contact, language or other sexually freighted activity; instead, she complained only of a few episodes, spread over more than four years, of Langham being alone with an underage male client. "The fourth element of a claim for sexual harassment is that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Hulsey*, 367 F.3d at 1244. "Determining whether the harassment was sufficiently severe or pervasive involves both an objective and a subjective component. [citation omitted] In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal quotes omitted).

The Eleventh Circuit considers an incident every two months to be insufficiently frequent to support a sexual harassment claim. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir. 1999) (en banc) (five inappropriate instances in eleven months were "far too infrequent" to support a sexual harassment claim). The frequency of Langham's allegedly inappropriate dealings with male clients was less than once a year and thus far too infrequent to support a claim.

Being alone with a male client, with no evidence that anything untoward occurred, is not severe conduct. Nor could such conduct be threatening or humiliating to the plaintiff. Finally, the plaintiff has no evidence that these rare occurrences interfered with her work performance or that they would have interfered with the performance of a reasonable employee. In sum, Langham's conduct with male clients could not possibly have created an objectively hostile work environment as to the plaintiff, and no plaintiff acquainted with Title VII could reasonably believe otherwise.

**B. Complaint of Sex Discrimination.**

The plaintiff's February 22 complaint to Riggins clearly encompassed an objection to naming Langham, rather than the plaintiff, to the position of assistant program coordinator. The defendant argues that this was not protected activity because the plaintiff could not reasonably believe this decision was discriminatory. (Doc. 30 at 27). For this proposition, the defendant cites generally to prior pages of its brief, but those pages do not address the selection of Langham rather than the plaintiff for that position. (*Id*. at 23-25). As discussed in Part III, the defendant's only beef with the plaintiff was her poor professional judgment in not reporting Langham sooner. The defendant concedes that this quality rendered her unfit only for positions involving direct patient contact, and it further admits that the assistant program coordinator position did not involve such contact. Moreover, the evidence indicates that the plaintiff was at least minimally qualified for the position and perhaps better qualified than Langham. In light of these circumstances, the defendant has not shown the plaintiff's belief that she had been discriminated against to be objectively unreasonable.[18]

The third element of the plaintiff's prima facie case is a showing that "there was a causal connection between the protected activity and the adverse action." *Kidd v. Mando American Corp*., 731 F.3d 1196, 1211 (11th Cir. 2013). As to the dissolution of the in-home therapy team, the demand for a medical examination, and the failure to assign the plaintiff to another therapist position, it is not possible for the plaintiff to make this showing, because it is uncontroverted that these

---

[18] Since the defendant has not shown the absence of protected activity, the Court need not determine whether the plaintiff had an objectively reasonable belief that she was the victim of sex discrimination concerning her failure to receive the outpatient therapist position and/or not being returned to an in-home therapist/school counseling position.

decisions were made before the plaintiff's February 22 complaint.[19]  She does not argue otherwise.

That leaves for consideration the plaintiff's termination.  For purposes of satisfying the prima facie case, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."  *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007).  A gap of even a month or more is sufficiently small to satisfy the prima facie case.  *E.g., Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks); *Donnellon v. Freuhauf Corp*., 794 F.2d 598, 600, 601 (11th Cir. 1986) (one month).  The four-day gap between the plaintiff's February 22 complaint and her February 26 termination thus establishes the causation element of the plaintiff's prima facie case.

The defendant's articulated reasons for terminating the plaintiff remain the same as they were for purposes of Count Two.  (Doc. 30 at 28).  As noted in Parts III.C and D, the defendant's reasons – the plaintiff's disqualification from positions with patient contact, her rejection of a position not involving patient contact, and the absence of other available positions – are legally sufficient and supported by record evidence.  This shifts the burden to the plaintiff to demonstrate the existence of a genuine issue of material fact concerning pretext.  To meet this burden, the plaintiff repeats her reliance on Langham's retention, Earnshaw's replacement, and the offer to her of a position performing treatment plan reviews.  (Doc. 45 at 21, 22).  But these matters are no more reflective of retaliation than they are of sex discrimination.

---

[19] The in-home therapy team was dissolved on or about January 19, and the demand for a medical examination was made sometime before February 7.  At the February 22 meeting, Riggins told the plaintiff she could not be placed in a position with direct patient contact before the plaintiff expressed her complaint.  (Riggins Declaration, ¶ 23; Plaintiff's Declaration, ¶¶ 43-44).

The plaintiff's only additional effort to show pretext in the retaliation context is to note the four-day gap between protected conduct and her termination. (Doc. 45 at 22).[20] Close temporal proximity satisfies the causation element for purposes of the prima facie case, but it does not, of itself, create a fact issue on pretext. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (two-week gap "is evidence of pretext, though probably insufficient to establish pretext by itself"). The defendant's evidence reflects that the temporal proximity in this case was coincidental to a decision already inevitable, and the plaintiff has done nothing to poke holes in the defendant's case. On the contrary, the plaintiff has testified that, at their February 22 meeting, Riggins told her the defendant had no available positions for her *before* she complained of sex discrimination. (Plaintiff's Exhibit 1, ¶¶ 43, 44).

## C. Summary.

Because it was not protected activity, the plaintiff cannot pursue a retaliation claim based on her complaint concerning Langham. Because she cannot raise a genuine issue as to pretext, the plaintiff cannot pursue a retaliation claim based on her termination following her complaint to Riggins of sex discrimination. And because all other asserted adverse actions occurred before she complained, the plaintiff cannot pursue any other retaliation claim based on her complaint to Riggins. Accordingly, the defendant is entitled to summary judgment with respect to Count Three.

## V. Count Four – Disability Discrimination.

The second amended complaint alleges that the defendant "denied Plaintiff her rights under the Americans with Disabilities Act, terminated her employment and failed to hire her for other available jobs with the Defendant and retaliated

---

[20] As promised, the Court will not advance additional theories of pretext that the plaintiff declined to raise herself.

against her under this Act." (Doc. 10 at 9, ¶ 66). As the defendant recognizes, (Doc. 30 at 17, 29), Count Four asserts four distinct forms of ADA violation: (1) requiring the plaintiff to undergo a medical examination; (2) firing her; (3) failing to provide her other employment; and (4) retaliating against her for complaining of disability discrimination.[21]

### A. Medical Examination.

The second amended complaint alleges that Riggins required the plaintiff to undergo a medical examination. (Doc. 10 at 5). "A covered entity shall not require a medical examination … unless such examination … is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The defendant argues that the medical examination was lawful because it was job-related and consistent with business necessity. (Doc. 30 at 29-30).[22]

The defendant justifies Riggins' demand for a medical examination as follows:

> As detailed above, the investigation disclosed substantial issues with Whitt's professional judgment regarding her legal and ethical obligations to the child patients in the In-Home Program under her care, and also an objective basis for questioning whether there was a medical explanation for those issues. BCMHC (1) had information that Whitt had a prior brain aneurysm; (2) knew that the Whitt [sic] was experiencing workplace problems; and (3) had medical evidence that the confusion resulting from a brain aneurysm could prevent Whitt from recognizing that impairment.

---

[21] For reasons expressed in footnote 6, supra, the Court rejects the defendant's suggestion that, because the plaintiff in her brief did not address the denial of therapist positions, that portion of Count Four is no longer in the case. (Doc. 48 at 8).

[22] The defendant suggests that the plaintiff in her brief conceded "she does not consider being required to undergo a medical exam as independently actionable." (Doc. 48 at 8). But her brief expressly argues that "[t]here was no medical reason to require that [she] be medically examined," (Doc. 45 at 22), which directly addresses an element of her claim and which cannot easily be construed as a concession that no such claim exists.

(Doc. 30 at 30).  The defendant identifies the purpose of the medical examination as being "to determine whether Whitt had an impairment."  (*Id*.).

From this explanation, it is clear that the defendant was not seeking to discover if the plaintiff had judgment issues – it had already determined that she did.  And it was not seeking to find a solution to those judgment issues, nor to decide if those issues affected her ability to perform her job or posed a risk to herself or others.  Instead, it appears the defendant was pursuing an idle curiosity as to the etiology of the plaintiff's judgment deficit.

The Eleventh Circuit decisions cited by the defendant do not suggest that this is an adequate justification for requiring a medical examination.  In *Owusu-Ansah v. Coca-Cola Co*., 715 F.3d 1306 (11th Cir.), *cert. denied*, 82 U.S.L.W. 3240 (Nov. 18, 2013) , the employer possessed evidence that the employee "had a potentially dangerous mental condition."  *Id*. at 1312.  In *Williams v. Motorola, Inc*., 303 F.3d 1284 (11th Cir. 2002), the employer had evidence that the employee had made "threats of violence."  *Id*. at 1291.  In *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999), the Court stated that, "where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity."  *Id*. at 935.  In each of these situations, the medical examination was sought to determine whether the employee could safely perform the duties of his job, not simply to find out what made him act as he did.

The business necessity inquiry under Section 12112 "analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria for [making] such a[n] [employment] decision."  *Owusu-Ansah*, 715 F.3d at 1311 (internal quotes omitted).  In context, this suggests that the employer must show a business need for obtaining the information about the existence vel non of a medical condition.  Satisfying managerial curiosity, with no further goal, seems unlikely to meet that standard.

The defendant in its terse treatment of this claim does not address the facts and limited scope of these cases. Instead, it places chief reliance on an enforcement guidance document from the EEOC. (Doc. 30 at 30). As quoted by the *Owusu-Ansah Court*, that document provides that a "medical examination of an employee may be 'job-related and consistent with business necessity' when an employer has a reasonable belief, based on objective evidence, that (1) an employee's ability to perform essential job functions will be impaired by a medical condition …." 715 F.3d at 1312-13 (internal quotes omitted). The defendant apparently reads this provision as permitting a medical examination merely to confirm that an employee experiencing performance issues has a related medical condition, with no further purpose. The Court is skeptical that the document is intended to be read so broadly but, in any event, the EEOC document "is entitled to respect only to the extent that it has the power to persuade." *Id*. at 1312 (internal quotes omitted). The defendant has not shown, or even attempted to show, that the agency document is persuasive in this respect, and for the reasons stated the Court is unable without the defendant's assistance to find it so.

The defendant's only other argument is that the plaintiff must show a "tangible injury" resulting from an unlawful medical examination. (Doc. 30 at 29, 30). "[O]ur sister circuits require that a non-disabled plaintiff at least show some damages (emotional, pecuniary, or otherwise) caused by a § 12112(d) violation. [citations omitted] We agree." *Harrison v. Benchmark Electronics Huntsville, Inc*., 593 F.3d 1206, 1216-17 (11th Cir. 2010) (footnote omitted). The plaintiff expressly claims to have experienced emotional distress as a result of the defendant's demand for a medical examination. (Doc. 10 at 9, ¶ 67). To the uncertain extent the defendant suggests that emotional injury from an unlawful

medical exam will not support a cause of action because it is not "tangible," it has not explained how such a position is consistent with *Harrison*.[23]

Nor has the defendant borne its burden of showing the plaintiff's inability to prove emotional damages from any unlawful medical examination. The defendant has simply announced that the plaintiff "has failed to show any tangible injury that occurred as a result of the medical evaluation." (Doc. 30 at 29; *accord id*. at 30). To carry its burden, the defendant must either negate the existence of emotional damages or point to materials on file demonstrating that the plaintiff cannot show the existence of such damages. *Clark*, 929 F.2d at 608. The defendant has done neither but has simply posited a conclusion. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.

### B. Failure to Hire.

This portion of Count Four challenges the same three decisions as does Count Two.

#### 1. Assistant program coordinator.

Because the defendant does not address the assistant program coordinator position awarded Langham, it cannot obtain summary judgment as to this portion of the plaintiff's claim.

#### 2. Outpatient therapist.

Absent direct evidence, a plaintiff claiming disability discrimination must utilize the *McDonnell Douglas* model devised in the Title VII context. *Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1193 (11th Cir. 2004). "To make

---

[23] Such a position would also be inconsistent with *Tice v. Centre Area Transportation Authority*, 247 F.3d 506 (3rd Cir. 2001), on which the defendant relies, since *Tice* deemed emotional damages sufficient to support a claim. *Id*. at 519.

a prima facie case of discrimination under the ADA, [the plaintiff] had to show a disability (whether real or perceived), that she was otherwise qualified to perform the essential functions of the job, and [that] she was discriminated against based upon the (real or perceived) disability." *Williams v. Motorola, Inc*., 303 F.3d 1284, 1290 (11th Cir. 2002). The defendant concedes for purposes of this motion that the plaintiff can show it regarded her as having a disability. (Doc. 48 at 8). The defendant denies the plaintiff's ability to establish the other two elements of her prima facie case. (Doc. 30 at 31).

There is evidence the defendant considers the "exercise of sound professional judgment" to be an essential function of a therapist. (Riggins Declaration, ¶ 21). The defendant argues that the plaintiff's delay in reporting suspected abuse reflected poor judgment and that "[t]his faulty judgment renders her unqualified for her job" for purposes of her prima facie case. (Doc. 30 at 31). The defendant cites no authority for this proposition, instead noting that an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams*, 303 F.3d at 1290. But there is no evidence the plaintiff was lacking in these abilities. As to judgment, "[e]xercising some degree of good judgment is arguably a function of every occupation … [b]ut the required *degree* of acuity and consistency of judgment varies between different jobs. The question at issue here is the degree of acuity and consistency of judgment necessary to perform Plaintiff's job." *Bishop v. Georgia Department of Family and Children Services*, 2006 WL 572031 at *3 (11th Cir. 2006) (emphasis added). The defendant has not provided evidence or argument at this level of specificity and so has not shown that the plaintiff lacked a threshold level of judgment. Moreover, and as discussed in Part III.C, the evidence would support an inference that the plaintiff did not in fact exercise poor judgment in failing to report suspected abuse because she did not in fact suspect

such abuse but merely observed Langham several times fail to avoid situations in which abuse could occur.[24]

While the third element of the plaintiff's prima facie case is phrased as whether she "was discriminated against based upon [her] (real or perceived) disability," that is actually the ultimate question in a discrimination case, and a plaintiff need not prove her entire case at this early stage. As the Eleventh Circuit has noted, "[w]e cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his prima facie case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's burden is not onerous." *Vessels*, 408 F.3d at 769. On the contrary, the limited function of the prima facie case is only that of "eliminating the most common nondiscriminatory reasons for" the adverse employment action. *Holland*, 677 F.3d at 1055 (internal quotes omitted).

The only element of the plaintiff's prima facie case under Title VII, as agreed by the parties, not already addressed or conceded for purposes of her claim of disability discrimination is a showing that "her employer treated similarly situated employees outside her classification more favorably" or, in the alternative, that she was replaced by, or passed over in favor of, a person without a real or perceived disability. The Court therefore concludes that only these issues are relevant to the third element of the plaintiff's prima facie case. *See Wolfe v. Postmaster General*, 488 Fed. Appx. 465, 468 (11th Cir. 2012) (addressing the existence vel non of similarly situated comparators as part of the disability plaintiff's prima facie case). Because the defendant does not address them, (Doc.

---

[24] The defendant asserts that "[k]nowledge of applicable state and federal laws is an essential function of Whitt's job" because this is listed under the "required knowledge, skills, and abilities" section of her job description. (Doc. 30 at 31; Defendant's Exhibit 6). But the defendant fails to argue that the plaintiff was unqualified to perform this function, or even that its inclusion in a job description automatically renders it an essential function.

30 at 31), it cannot obtain summary judgment based on a failure to satisfy the prima facie case.

The defendant identifies the same legitimate, non-discriminatory reason for its decisions as it asserts with respect to the plaintiff's claims of sex discrimination. (Doc. 30 at 31-32). As noted in Part III.C, this is a legally sufficient reason supported by record evidence, and the burden shifts to the plaintiff to show a genuine issue as to pretext. The plaintiff's sole effort to meet this burden is to point out that she was terminated about 24 days after her neurologist reported his findings, (Doc. 45 at 22), which means she was denied the outpatient therapist position about 20 days after his report.[25] But this timing is insufficient to undermine the defendant's evidence that it disqualified the plaintiff from any therapist position involving direct patient contact due to the poor judgment it believed she had displayed. This is especially so since the neurologist's findings were, as the plaintiff insists, inconsistent with the existence of a disability. (Plaintiff's Exhibit 5). Moreover, the plaintiff admits that the defendant did not seek a neurological report because it suspected a disability; instead, the "only reason" the defendant required a medical exam was to retaliate against the plaintiff for her complaint about Langham. (Doc. 45 at 22).

### 3. In-home therapist.

This claim fails for reasons set forth in Parts III.C and V.B.2.

### C. Termination.

This claim fails for reasons set forth in Parts III.C, III.D and V.B.2.

---

[25] Again, the Court will not construct pretext arguments on the plaintiff's behalf.

**D. Retaliation.**

To the extent that Count Four addresses retaliation for complaining of disability discrimination, it is redundant with Count Five and is due to be dismissed on that basis.

**E. Summary.**

The defendant is entitled to summary judgment with respect to all aspects of Count Four except: (1) the plaintiff's claim of an unlawful medical examination; and (2) the plaintiff's claim that she was denied the position of assistant program coordinator based on a perceived disability.

**VI. Count Five – Retaliation (ADA).**

The plaintiff's only internal complaint concerning disability discrimination occurred on February 22, 2011, four days before her termination. (Doc. 45 at 22). The defendant concedes that, under the plaintiff's version of the facts, she thereby engaged in protected activity. (Doc. 30 at 33). Termination is of course an adverse employment action and, as discussed in Part IV.B, the close temporal proximity between protected conduct and adverse action satisfies the causation element of the plaintiff's prima facie case.

The parties' evidence and arguments as to legitimate reasons and pretext remain the same as under Count Three, and with the same result. For reasons stated in Part IV.B, the defendant is entitled to summary judgment with respect to Count Five.

**VII. Defamation.**

The plaintiff in formal discovery confined her defamation claim to the following: (1) on or about February 1, 2011, Riggins said to the plaintiff, in the presence of Tanner and Vinson, that the plaintiff "was hallucinating and delusional" and thus "no longer able to perform [her] job responsibilities"; and (2)

Anne Chipman and Dr. Cummings both stated to the EEOC investigator that the plaintiff suffers from dementia.  (Defendant's Exhibit 20, ¶ 5).[26]

"To establish a prima facie case of defamation, a plaintiff must show:  [1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Ex parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) (emphasis and internal quotes omitted).

In order to establish the publication element, "there must be a communication of a defamatory matter to a third person." *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1093 (Ala. 1988).  "[W]hen officers and employees of a corporation act within the scope of their employment and within the line of their duties, they are not third persons vis-à-vis the corporation." *Id*.  If the speaker was engaged in corporate business and the communication to the hearer "falls within the proper scope of that employee's knowledge or duties," there is no publication for purposes of a defamation claim. *Id*.  The same rule applies to non-corporations. *Burks v. Pickwick Hotel*, 607 So. 2d 187, 189-90 (Ala. 1992).

Riggins is the defendant's executive director, Tanner the defendant's clinical director and the plaintiff's immediate supervisor, and Vinson the defendant's human resources director.  (Doc. 32 at 1, ¶ 1; Doc. 45 at 1, ¶ 1).  According to the plaintiff, Riggins' comment occurred at a meeting called to discuss what duties the plaintiff would have going forward (in the wake of her discredited complaint concerning Langham), and in that context Riggins asked the plaintiff to see a neurologist due to concerns she was hallucinating and delusional, with an assurance she would receive a therapist position if the neurologist cleared

---

[26] Chipman is employed by the defendant as its children's outpatient service coordinator, while Dr. Cummings is the defendant's medical director.  (Doc. 32 at 10, ¶ 21; Doc. 45 at 8, ¶ 21).

her.  (Plaintiff's Deposition at 159-62).  Because Riggins, Tanner and Vinson were the three employees most centrally concerned with where to place the plaintiff in light of the dissolution of the in-home therapy team and the defendant's concerns regarding the plaintiff's judgment, Riggins was engaged in corporate business and the others were acting within the scope of their employment at the time of the allegedly defamatory statement.[27]  There was thus no publication, without which the plaintiff's claim must fail.  The plaintiff offers no discernible response.  (Doc. 45 at 22-23).

The plaintiff's interrogatory response suggests that Chipman and Dr. Cummings spoke directly with an EEOC investigator.  The defendant's brief suggests they made the challenged statements internally, with those statements included in the defendant's written position statement to the EEOC.  (Doc. 30 at 36-37).  Either way, the defendant argues that their statements are protected under the affirmative defense of "conditional privilege."  (*Id*.).  The defendant's obscure briefing makes it difficult to determine if the conditional privilege applies, but in any event the defendant concedes that the privilege is lost if the communication is made with actual malice.  (*Id*. at 37).  Because the defendant has not argued or attempted to show that the plaintiff cannot establish actual malice, it is not entitled to summary judgment on this ground.[28]

---

[27] *Cf. Nelson*, 534 So. 2d at 1089, 1093 (corporate officer did not publish when he told the plaintiff's co-employee that the plaintiff had been caught stealing grain; investigation of grain shortage was corporate business, the officer was acting within the scope of his employment both in general by investigating the shortage and in particular by speaking with the co-employee (since he might reasonably have had important information concerning the grain shortage), and the co-employee acted within the scope of his employment by taking part in the investigation).

[28] The defendant asserts at one point that a communication between one party with an interest (Chipman and Dr. Cummings) and another with a corresponding interest (the EEOC) "does not constitute a publication."  (Doc. 30 at 37).  If correct, satisfaction of the corresponding interest test would defeat a defamation claim regardless of actual malice.  But, according to the defendant's authority, satisfying the "corresponding interest" test triggers a conditional privilege; it does not negate a publication.  *Butler v. Town of Argo*, 871 So. 2d 1, 25 (Ala. 2003).

Finally, the defendant argues that being accused of suffering from dementia is not actionable per se but requires proof of special damages. (Doc. 30 at 37-38). "[T]o constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude …." *Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978) (internal quotes omitted); *accord Butler*, 871 So. 2d at 17; *Nelson*, 534 So. 2d at 1091. When the statement is written rather than oral, a broader range of statements is actionable per se. "In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of a crime, the law presumes damages to the reputation, and pronounces it actionable per se." *Ceravolo*, 364 So. 2d at 1157 (internal quotes omitted); *accord Butler*, 871 So. 2d at 16.

Dementia is not a crime, so an accusation of suffering from dementia will not support a claim of slander per se. As noted above, however, the defendant has muddied the water as to whether the statements by Chipman and Dr. Cummings on which the plaintiff relies were made to the EEOC orally or in writing, so the Court cannot conclude on this record that the plaintiff alleges only slander. The defendant has also failed to address whether an accusation of dementia does or may expose a plaintiff to public ridicule or contempt and so has not shown that such an accusation will not support a claim of libel per se.

Even were it assumed that the plaintiff claims only slander by Chipman and Dr. Cummings or that a written accusation of dementia does not support libel per se, the defendant could not receive summary judgment as to their statements. The defendant argues the plaintiff is precluded from claiming special damages because she did not plead them in accordance with Rule 9(g). (Doc. 30 at 37-38). Assuming without deciding that the defendant has not waived this argument by withholding it until this late stage of the proceedings, the plaintiff did in fact comply with Rule 9(g).

"If an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g). "[T]he rule is designed to inform defending parties as to the

nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint." *Great American Indemnity Co. v. Brown*, 307 F.2d 306, 308 (5th Cir. 1962). Thus a complaint that "set out various items of damage and various elements of damage" complied with the rule. *Id*. at 308 & n.2.

"Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, [citation omitted], and the general rule is that they are limited to material loss capable of being measured in money [citation omitted]." *Butler*, 871 So. 2d at 18 (internal quotes omitted). Special damages include lost income. *Tanner v. Ebbole*, 88 So. 3d 856, 863 (Ala. Civ. App. 2011). Count Six explicitly alleges that the defendant's defamatory statements caused the plaintiff a "loss of income and loss of benefits." (Doc. 10 at 10-11). The defendant – which addresses neither the law construing Rule 9(g), the elements of special damage recognized by Alabama law, nor the amended complaint's language – has failed to explain how the plaintiff could be deemed to have violated the rule, and the Court will not look for possibilities on its behalf.

In a related vein, the defendant posits that the plaintiff "has no evidence of special damages." (Doc. 30 at 38). As it did with respect to injury from its required medical examination in Part V.A, the defendant has merely announced a conclusion without pointing to anything in the record that negates special damages or that shows the plaintiff is unable to prove them. Again, "[e]ven after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark*, 929 F.2d at 608.

## VIII. Negligence/Wantonness.

Count Seven alleges that the defendant negligently or wantonly failed to: (1) train its employees; (2) supervise or monitor its employees; and (3) investigate her claims of sex discrimination, sexual harassment/hostile work environment and retaliation. (Doc. 10 at 11).

The defendant first argues that a claim of what it terms "negligent management" requires proof of an underlying wrong by its employees and concludes that Count Seven cannot survive if Counts One through Six do not survive. (Doc. 30 at 39).[29] As discussed above, portions of Counts Two, Four and Six do survive the defendant's motion for summary judgment. To that extent, Count Seven survives as well.

The defendant next notes, correctly, that liability depends upon both the employee's incompetency and on the employer's actual or constructive awareness of the incompetency, based on past conduct reflecting the incompetency. (Doc. 30 at 39). *See Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995). The defendant asserts the plaintiff cannot establish these elements of her claim because she has no evidence the defendant was aware of any of the matters of which she complained before she voiced her complaints in January and February 2011. (Doc. 30 at 39-40). In the first place, the defendant again states a conclusion without pointing to record evidence that negates such awareness or shows the plaintiff cannot prove such awareness. More fundamentally, however, the defendant assesses awareness from the wrong perspective. It does not matter whether the defendant knew, for example, whether Riggins or Tanner was discriminating against the plaintiff before she complained of sex discrimination; what matters is whether the defendant knew or should have known that Riggins and/or Tanner had a history of practicing sex discrimination, whether against the plaintiff or anyone else.

In a related vein, the defendant denies that the plaintiff suffered injury due to Langham's flirtation, laziness and conduct towards patients. (Doc. 30 at 40). Again, this is a bald conclusion unaccompanied by any citation to the record that supports the proposition. But in any event, lack of damage from Langham's conduct is irrelevant, at least with respect to the portions of Count Seven that

---

[29] The plaintiff concedes that the underlying wrongs on which she relies are limited to those encompassed within Counts One through Six. (Doc. 45 at 23).

remain, because Langham is not the allegedly incompetent employee. With respect to the placement of Langham rather than the plaintiff in the position of assistant program coordinator, the allegedly incompetent employees would appear to be Tanner and perhaps Riggins. With respect to the demand for a medical examination, the allegedly incompetent employees would appear to be Riggins, Vinson and perhaps Tanner. And with respect to the defamation claim, the allegedly incompetent employees are Chipman and Dr. Cummings.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **granted** with respect to the entirety of Counts One, Three and Five. The motion is **granted** with respect to all aspects of Count Two except the defendant's placement of Langham rather the plaintiff in the position of assistant program coordinator, as to which the motion is **denied**. The motion is **granted** with respect to all aspects of Count Four except the defendant's requirement of a medical examination and its placement of Langham rather the plaintiff in the position of assistant program coordinator, as to which the motion is **denied**. The motion is **granted** with respect to all aspects of Count Six except the statements by Anne Chipman and Dr. Cummings to the EEOC investigator that the plaintiff suffers from dementia, as to which the motion is **denied**. The motion is **granted** with respect to all aspects of Count Seven as to which the underlying count or portion of count has been dismissed and is otherwise **denied**.

DONE and ORDERED this 12th day of December, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE